J-S39010-20
J-S39011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JUAN MORALES | : | |
| Appellant | : | No. 1111 EDA 2019 |

Appeal from the Judgment of Sentence Entered November 21, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004004-2017

\*\*\*\*\*

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JUAN MORALES | : | |
| Appellant | : | No. 1112 EDA 2019 |

Appeal from the Judgment of Sentence Entered November 21, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004444-2017

BEFORE:   LAZARUS, J., OLSON, J., and PELLEGRINI, J.\*

MEMORANDUM BY LAZARUS, J.:                    **FILED OCTOBER 09, 2020**

_____

\* Retired Senior Judge assigned to the Superior Court.

Juan Morales appeals[1] from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after he was convicted by a jury of two counts of endangering the welfare of children (EWOC),[2] a third-degree felony.[3] Counsel has also filed an **Anders**/**McClendon**/**Santiago**[4] brief and accompanying motion seeking to withdraw from representing Morales on appeal. After careful review, we deny counsel's motion to withdraw and remand for the filing of an advocate's brief.

Morales was arrested in North Carolina in May 2017 on a Pennsylvania warrant issued in connection with the alleged sexual assault of two minor female twins (Children). Children, who were seven years old at the time of the alleged assaults, are the daughters of Morales' long-time paramour, N.S.[5]

---

[1] On January 2, 2020, our Court sua sponte consolidated the two underlying appeals, 1111 EDA 2019 and 1112 EDA 2019. **See** Pa.R.A.P. 513.

[2] 18 Pa.C.S.A. § 4304(a)(1).

[3] Instantly, the criminal information charged Morales with EWOC as a third-degree felony (course of conduct), alleging that the crime occurred "[o]n diverse dates between 2012 through 2014." **See** Criminal Information, 5/16/17, at 1; **see also** 18 Pa.C.S.A. § 4304(b)(ii) ("If the actor engaged in a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree.").

[4] **Anders v. California**, 386 U.S. 738 (1967); **Commonwealth v. McClendon**, 434 A.2d 1185 (Pa. 1981); **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).

[5] N.S. and Morales are the parents of a younger daughter who was an infant at the time of the alleged assaults on Children.

Morales was charged with two counts each[6] of rape of a child, involuntary deviate sexual intercourse (IDSI), unlawful contact with a minor, aggravated indecent assault of a child, sexual assault, EWOC, corruption of minors, indecent exposure, indecent assault of a child less than 13 years of age, simple assault, recklessly endangering another person (REAP), and dissemination of explicit sexual materials to a minor.

The trial court set forth the relevant factual history underlying the charges as follows:

> [N.S.] testified that she was in a relationship with [Morales] and he lived in the apartment with her and her children. [N.S.] testified that she sometimes left her twin seven[-]year[-]old daughters, [Child 1 and Child 2— collectively, Children], home with [Morales] while she went to work. [N.S.] testified that on June 29, 2014[,] around 2:30 a.m., she realized that [Morales] was not in the bed next to her and walked to the living room, where she observed [Morales] on the sofa with his "penis out" and "touching himself" while [Child 1] was balled up with her arms around her knees at her chest on the other end of the couch. [N.S.] explained that she then attacked [Morales] using clenched fists, [] which [Morales] did not resist, until he pinned her down on their mattress, only allowing her to use the bathroom. [N.S.] explained that she did not call the police due to fear that [Morales] would wake up and hear her on the phone. [N.S.] testified that she was able to leave the house with [C]hildren, after she told [Morales] she was [] going to take the[m] to the flea market. Instead of going to the flea market, [N.S.] said that she went to her mother's house where she first called police and then continued on to St. Christopher's Hospital for Children where she was interviewed by a police officer. On the following day, she and [Children] went to an appointment at [the] Special Victims Unit (SVU) and [] she did not talk to [Children] about what happened with [Morales] or what they were allowed to talk about. [N.S.]

_____

[6] Morales was charged under two separate docket numbers for each minor victim, CP-51-CR-0004444-2017 and CP-51-CR-0004004-2017.

stated that she did not communicate or see [Morales] again at that time.

[N.S.] also described moving with [C]hildren to North Carolina in March of 2015, explaining that she lived near and remained in contact with [Morales'] older sister[,] but claimed that she did not know whether [Morales] was living in North Carolina or Philadelphia. [N.S.] described the first time she saw [Morales] in 2016 at his mother's North Carolina home and how she was scared of him during this encounter.

On cross-examination, [N.S.] explained that during their relationship she and [Morales] would have arguments, around [Children], sometimes caused by [Morales'] "w[a]ndering eye for women." [N.S.] testified that before [Children] were interviewed at St. Christopher's Hospital for Children she did not speak to them about what occurred with [Morales]. [N.S.] stated that the Department of Human Services (DHS) spoke to [Children] at the hospital and also visited their house.

Next, Officer Robert Caban testified that he met with [N.S.] and [Children] at St. Christopher['s] Hospital for Children in response to a reported rape in June 2014. Officer Caban recalled that [N.S.] told him about what she saw the night before regarding [Morales'] "private area out" in front of [Child 1]. Officer Caban could not recall if he spoke with [Children] directly. On cross-examination, Officer Caban stated several times that he could not recall specific details regarding his interview with [N.S.] and [Children].

[Child 1] testified that she first met [Morales] when her mom started dating him when she was six or seven. [Child 1] continued stating that [Morales] started living with them when she was seven and sometimes he watched her and [Child 2] while their mother was at work. [Child 1] also testified that [Morales] touched her more than once, describing how [Morales] showed her his phone with "people having sex" on it. [She] described how [Morales] exposed his private parts to her, touched her private parts, made her put his private part in her mouth, and how he licked her private part over her underwear over the course of [a] few days. [She also] testified that [Morales] put his private part on her front private part once while she was laying down while he moved in a back and forth motion. [She] continued describing an incident where [Morales] put his private part in her mouth while she was alone with him in the living room. [She also] stated that she did not tell [N.S.] when these

- 4 -

things were going on because she was scared and thought something bad might happen if she told.

[Child 1] testified that [N.S.] found out when she came downstairs while [Morales'] private part was exposed and she was on the couch with him. [She] recalled talking with a lady in a room with a camera where she told her everything that happened to her. [She] also recalled talking with a detective. On cross-examination, [Child 1] testified that when she moved to Candor, North Carolina[,] she lived with just [N.S.] and [her] sisters. [She] explained that she never told anyone at school or in her family what [Morales] was doing to her.

[Child 2] testified that she recognized [Morales] as her [baby] sister'[s] dad who lived with her when she was about seven years old and sometimes watched her when her mom was not home. [Child 2] described one day when she was home alone with [Morales], waking up in [N.S.]'s bed with [Morales'] hand inside her shorts but over her underwear, rubbing on her front private part while he forced her hand on to his exposed private part moving it in a rubbing motion. [She] stated that on the same day and other days [Morales] showed her videos of men and women in various stages of undress doing "inappropriate things." She could not remember if [Morales] said anything to her while showing her the videos. [She] further testified that [Morales] placed his private part on her back private part and that she saw "slimy stuff" come out of [Morales'] private part when they were alone in the bedroom. [She] recalled speaking with police officers and telling them what happened to her. [She] testified that she never told anyone else about what [Morales] was doing because he asked her not to and that he never threatened to hurt her or her family.

On cross-examination, [Child 2] recalled after going to the hospital speaking to a lady in a room with a table and chair. [She] explained that she never told any teacher, principal, crossing guard, student, police officer at school, or family member about [Morales] touching her private part. [She] recalled moving to Candor, North Carolina[,] with [N.S.] and [her] sisters and being babysat by [Morales'] sister.

Denise Wilson, Manager of Forensic Services at Philadelphia Children's Alliance (PCA), testified regarding the forensic interview process, [the interview] room, and how parents are not in the room during the interview. Portions of the PCA interviews were intermittently shown to the jury throughout Ms. Wilson's testimony. Ms. Wilson described both [Children] as being reluctant to discuss

what happened for fear of making [N.S.] mad because they "told their business." On cross-examination, Ms. Wilson detailed her interactions with [Children] and how it was her opinion that the[y] wanted to give her more information instead of assuming that they were being untruthful.

Next, Detective Brian Meissler testified that he was the assigned investigator on this case and that he met [N.S.] and [Children] at St. Christopher's Hospital for Children, where he spoke to [Children] quickly and took a formal statement from [N.S.] While reviewing his handwritten statement, Detective Meissler admitted that he made a mistake on the form substituting the name Jose for [Morales'] name Juan and that there was no mention during the interview with [N.S.] of another individual.

Detective Meissler explained that he typically writes while conducting interviews and when the interview is finished he "ask[s] them to read it . . . over and sign it, and sign and date the last page." Detective Meissler explained that when he completed this interview with [N.S.] he followed this procedure with her and since there were no initials where changes were made he believed "she did not make any corrections." Detective Meissler recalled [Child 1's] second interview with him at the police station, noting how at the end of the interview she wrote "she sail [sic] him red hand did [sic]" above her signature. Detective Meissler stated his belief that [Child 1] was withholding information during the interview.

On cross-examination, Detective Meissler described what a rape kit is, the procedures [for] obtaining any evidence to be placed in a rape kit, and how no biological evidence of the offender was found in [Children's] rape kits. Detective Meissler explained why he continued questioning [Child 2] after she answered "no" to the question "Did [Morales] ever touch you with his penis?" testifying that it was his belief based on his 15 years of experience that the she "was withholding information that she didn't want to talk about[.]" The Commonwealth made two stipulations before resting their case-in-chief; the first stipulation concerned the date and time [Children] were seen at St. Christopher's Hospital for Children and the second stipulation stated [Morales'] date of birth as October 13, 1986.

For the defense, [Morales'] current girlfriend, Samantha Rivera, testified that when she met [Morales] he was living in North Carolina with his mother and [N.S.]. Ms. Rivera stated that [N.S.] told her that the allegations against [Morales] were not true. On cross-

examination, Ms. Rivera again explained that when she asked [N.S.] if the allegations against [Morales] were true, [N.S.] responded "no" and that "she could not talk about it."

Lastly, [Morales] testified that, on June 28, 2014, he attended a family party with his then-girlfriend, [N.S.], and [C]hildren. During the party, he and [N.S.] got into an altercation. [Morales] claimed that after arriving home[, N.S.] wanted to continue to argue[. I]nstead[, Morales] ignored her until he thought she was asleep while he smoked, played x-box, and texted on his phone. After leaving the bedroom to get something to drink[,] [Morales] explained that [N.S.] confronted him with his cell phone asking him to explain text messages and when she did not like his response, swung on him and threw the phone at him, hitting him in the nose. [Morales] continued describing how he pushed and held [N.S.] down until she calmed down and then they both went to sleep. The next morning[,] [N.S.] suggested they go to flea market and they all got dress[ed] to go, but [N.S.] drove off without [Morales] after he went to retrieve the baby's sippy cup.

[Morales] stated that he called [N.S.] a few times[,] but she did not answer and later he received a threatening phone call from [N.S.]'s brother calling him a pedophile and threatening to kill him. [Morales] said that he was scared so he contacted his mother to tell her what was going on and then traveled with his mother to Charlotte, North Carolina[,] where he stayed until he was arrested in 2016. [Morales] also detailed [N.S.]'s move with [C]hildren to Candor, North Carolina[,] about five or six months after he moved to Charlotte. During this time, he claimed that [N.S.] would visit him in his mother's home and was given a key to his mother's house. Lastly, [Morales] stated that he never sexually assaulted [Children].

On cross-examination, [Morales] explained that through family members he heard that authorities were looking for him and learned about the nature of the allegations against him. [Morales] explained that once [N.S.] and [C]hildren moved to North Carolina[,] he resumed his romantic relationship with [N.S.] and would . . . keep[] his distance from [Children].

Trial Court Opinion, 10/25/19, 2-9 (citations to notes of testimony omitted).

After a four-day jury trial held in August 2018, Morales was acquitted of all charges except two counts of EWOC; the jury specifically found that there

was a "course of conduct" with regard to the EWOC charges based on "diverse dates between 2012 through 2014." **See** Verdict, 8/24/18; Commonwealth's Criminal Information, 5/16/17, at 1; **see also supra** n.3; **infra** n.17. On November 21, 2018, the court sentenced Morales to two consecutive terms of 2½ to 5 years' imprisonment. Morales filed post-sentence motions; they were deemed denied by operation of law.[7] Morales filed timely notices of appeal for each docket number below[8] and complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[9]

_____

[7] Although the trial court entered an order on April 2, 2019, deeming Morales' post-sentence motions denied by operation of law in case number 4444-2017, it did not enter an order denying his post-sentence motions in case number 4004-2017 until February 18, 2020, in response to our Court's rule to show cause. **See** Pa.R.Crim.P. 720(B)(3)(c). In any event, the appeal is properly before us. **See** Pa.R.A.P. 905(a)(5) (stating that initially filed premature notice of appeal shall be treated as filed on date appealable order entered).

[8] Morales has complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), which requires the filing of "separate appeals from an order that resolves issues arising on more than one docket." **Id.** at 977. **See also Commonwealth v. Johnson**, 2020 PA Super 164 (Pa. Super. filed July 9, 2020) (en banc) (revisiting **Walker** holding) and **Commonwealth v. Larkin**, 2020 PA Super 163 (Pa. Super. filed July 9, 2020) (en banc) (same).

[9] The trial court opinion inaccurately states that Morales filed a Post-Conviction Relief Act (PCRA) petition in December 2018, when, in fact, he never filed such a petition. Rather, this is a direct appeal from Morales' judgment of sentence following the denial of post-sentence motions.

Morales' attorney, Gary S. Server, Esquire, has filed an **Anders** brief

seeking to withdraw on appeal. In his **Anders** brief, counsel raises the following

issues for our consideration:

(1) Whether the [c]ourt erred when it permitted the jury to view the videos of the victims' [PCA] forensic interviews where they constituted improper bolstering of credibility.

(2) Whether the adjudication of guilt for EWOC is based upon insufficient evidence where the Commonwealth failed to prove beyond a reasonable doubt that [Morales] endangered the welfare of [C]hildren by knowingly violating a duty of care, protection and support where he was acquitted by the jury of the underlying sexual assault charges?

(3) Whether the adjudication of guilt for EWOC is against the weight of the evidence and shocking to one's sense of justice where the jury acquitted [Morales] of the underlying sexual assault charges, where [N.S.] had both a motive to fabricate and a motive to coach [C]hildren to fabricate, where there was a lack of prompt complaint and where subsequent to the alleged incidents [N.S.] and [C]hildren renewed their relationship with [Morales] in North Carolina.[10]

**Anders** Brief, at 6-7.[11]

Prior to reviewing Morales' claims, we must determine if counsel has

complied with the procedural requirements for withdrawal. An attorney seeking

to withdraw on appeal must comply with certain procedural and briefing

requirements. Specifically, counsel must:

1) petition the [C]ourt for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the brief to the [appellant]; and 3) advise the [appellant] that

_____

[10] Morales preserved his weight of the evidence claim by including it in his post-sentence motions. **See** Pa.R.Crim.P. 607.

[11] We have renumbered counsel's issues for ease of disposition.

- 9 -

he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the [C]ourt's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (en banc) (citation omitted). In addition, our Supreme Court in *Santiago* stated that an *Anders* brief must:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

Counsel also must provide the appellant with a copy of the *Anders* brief, together with a letter that advises the appellant of his or her right to "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the [C]ourt's attention in addition to the points raised by counsel in the *Anders* brief." *Commonwealth v. Nischan*, 928 A.2d 349, 353 (Pa. Super. 2007) (citation omitted). Substantial compliance with these requirements is sufficient. *Commonwealth v. Wrecks*, 934 A.2d 1287, 1290 (Pa. Super. 2007).

Here, counsel has filed a motion to withdraw and an *Anders* brief. In his motion, counsel states that after a thorough and conscientious examination of the record, he has determined that the appeal is wholly frivolous. Motion to Withdraw, 2/9/20, at ¶¶ 2-3. Additionally, counsel states in his motion that he

mailed a copy of the ***Anders*** brief to Morales and a letter, which he attached to the motion, advising Morales of his right to retain private counsel, represent himself on appeal, and/or raise any additional issues he believed the Court should consider.[12]  ***Id.*** at ¶¶ 4-6; ***see also*** Letter from Gary S. Server, Esquire, to Morales, 2/9/20, at 1.  Finally, counsel's brief sets out three issues of arguable merit and, pursuant to the dictates of ***Santiago***, explains why he believes the appeal to be frivolous.  Accordingly, counsel has substantially complied with the requirements of ***Anders***, ***McClendon***, and ***Santiago***.

Although counsel has fulfilled the mechanical requirements for successfully seeking leave to withdraw from representing Morales, we cannot agree with his assessment that the appeal is wholly frivolous.  We now turn to our independent review of the record and the claims raised by Morales to explain our decision to deny counsel's petition to withdraw and remand for the preparation of an advocate's brief.

In his first issue, Morales argues that the trial court impermissibly permitted the jury to view forensic interviews of the Children where the videos "constituted improper bolstering of [the Children's] credibility."  ***Anders*** Brief, at 17.

"[A] trial court's ruling on evidentiary questions is within the sound discretion of that court and will not be reversed absent a clear abuse of discretion.  ***Commonwealth v. Delbridge***, 771 A.2d 1, 10 (Pa. Super. 2001)

---

[12] Morales has not filed a response to counsel's ***Anders*** brief.

(citation omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law." **Commonwealth v. Mickel**, 142 A.3d 870, 874 (Pa. Super. 2016).

Instantly, the trial court introduced portions of the videos of the Children's PCA interviews to the jury during the direct examination of the Children's forensic interviewer, Ms. Wilson. The court also replayed the videos to the jury during deliberations, with no objection from counsel. **See** N.T. Jury Trial, 8/27/18, at 3, 5 (in middle of deliberations, jury asked trial judge to view victims' recorded PCA interviews; judge complied and replayed videos). The interviews were conducted just one day after the June 29, 2014 alleged sexual assault on Child 1. The trial court concluded that the evidence "was cumulative of the victims' testimony and[,] thus[,] relevant admissible evidence." Trial Court Opinion, 10/25/19, at 17. Relying on **Commonwealth v. Shelton**, 170 A.3d 549 (Pa. Super. 2017), the trial judge states in his Rule 1925(a) opinion that "[a]though the victim[s were] able to testify at trial about many details of the abuse, from [its] review of the transcribed portions of the video recording, [it] discern[ed] that the victim[s] reported the event of abuse more fully, with a greater level of detail, at [their] forensic interview[s]." Trial Court Opinion, 10/25/19, at 18, citing **Shelton**, 170 A.3d at 552.

In **Shelton**, **supra**, our Court found that the trial court did not err in admitting a victim's previously recorded forensic interview under Pennsylvania Rule of Evidence 803.1(3), where the recording contained the victim's recorded recollection concerning a matter about which she once knew "but now cannot

- 12 -

recall well enough to testify fully and accurately." *Id.* at 552 (quotation in original). Additionally, the trial court concluded that the information in the recording was not merely cumulative of the victim's trial testimony. *Id.* Finally, the court ruled the video admissible where the recording was conducted within one week of the victim's abuse report, when the victim admitted her memory of events was much better then, and where the recording reported the victim's abuse more fully. *Id.* at 552-53.

Introduction of a prior recorded recollection under Rule 803.1(3), an exception to the rule against hearsay, is permitted where the witness is subject to cross-examination regarding the prior statement and the following criteria are established:

> **(3)** Recorded Recollection of Declarant-Witness. A memorandum or record made or adopted by a declarant-witness that:
>
> > **(A)** is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately;
> >
> > **(B)** was made or adopted by the declarant-witness when the matter was fresh in his or her memory; and
> >
> > **(C)** the declarant-witness testifies accurately reflects his or her knowledge at the time when made.
>
> If admitted, **the memorandum or record** may be read into evidence and received as an exhibit, but **may be shown to the jury only in exceptional circumstances** or when offered by an adverse party.

Pa.R.E. 803.1(3) (emphasis added).

Despite the fact that the trial court concludes in its Rule 1925(a) opinion that the interviews were admissible under Rule 803.1(3) as a recorded

- 13 -

recollection, counsel in his ***Anders*** brief only discusses the relevancy of the interviews (stating interviews relevant to question of whether Children had been coached by N.S. to accuse Morales), ***Anders*** Brief, at 23, and offers no argument on either the reliability of the videos or how they fit within an exception to the hearsay rule. The Commonwealth, on the other hand, "relies on the trial court's opinion," finding it "thoroughly explains . . . why each of [Morales'] claims [is] meritless," Appellee's Brief, at 8, and then briefly discusses the relevancy of the videos and states that that they did not improperly bolster the Children's credibility where the Commonwealth did not give personal assurances of Children's veracity or indicate that information not before the jury supported Children's testimony. ***Id.*** at 8-9.

To confuse the issue even further, at trial the Assistant District Attorney offered a completely different basis for seeking to admit the videos of the Children's interviews, stating:

> And, Your Honor, I'm not seeking to admit it under a prior consistent statement. I agree with [opposing] counsel that [Child 1] was not impeached.
>
> **I'm seeking to admit it under 42 Pa.C.S. § 5985.1, which is essentially the Tender Years Exception**, and also comment, on No. 5 under Rule 802, that says that the out-of-court statements of a child that is under the age of 12 when the statements are made, [are] admissible.
>
> **There are two prongs. I believe the formal process is that the Court has to hold an in-camera evidentiary hearing to otherwise determine the relevance and the reliability of that out-of-court statement.**
>
> And, secondly, if the child is unavailable, which is not true for [Child 1], then there is to be a finding of emotional distress. If the child is

available then there's no confrontation clause issue[] because obviously the child is available.

N.T. Jury Trial, 8/22/18, at 63 (emphasis added).

Hearsay may also be admitted pursuant to a state statute as set forth in Pa.R.E. 802. "The Tender Years Statute creates [such] an exception to the hearsay rule in recognition of the fragile nature of the victims of childhood sexual abuse." ***Commonwealth v. G.D.M.***, 926 A.2d 984, 988 (Pa. Super. 2007) (citation omitted). Under Pa.R.E. 802(5), "[i]n a criminal or civil case, an out-of-court statement of a witness 12 years of age or younger, describing certain kinds of sexual abuse, may be admitted pursuant to 42 Pa.C.S. § 5985.1." Pa.R.E. 802(5). Section 5985.1(a)(1) provides, in relevant part:

**(a) General rule.**

(1) An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in paragraph (2),[13] not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(i) **the court finds**, **in an in camera hearing**, that the evidence is **relevant** and that the time, content **and** circumstances of the statement provide **sufficient indicia of reliability**; and

(ii) the child []:

(A)   testifies at the proceeding[.]

---

[13] Under subsection 5985.1(a)(2), the following enumerated offenses apply to subsection 5985.1(a)(1):  assault, sexual offenses, corruption of minors, sexual abuse of children, unlawful contact with minor, and EWOC.  Morales was charged with all of these offenses.

42 Pa.C.S.A. §§ 5985.1(a)(1)(i), (ii)(A) (emphasis added). For purposes of establishing sufficient indicia of reliability, the term primarily "relates to evidence regarding circumstances in which the out-of-court statements were made, not the reliability or competency of the child witness at the time the statements are offered into evidence under the statute." ***Commonwealth v. Delbridge***, 855 A.2d 27, 46 (Pa. 2003) (under Tender Years Exception, factors to be considered by trial court in determining whether child declarant was likely to be telling truth when statement was made include "the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age and the lack of a motive to fabricate.").

Interestingly, neither the trial court, Morales' counsel, nor the Commonwealth even mention the Tender Years Exception (TYE) on appeal with regard to admissibility of the PCA interviews. However, we are aware that we can affirm the trial court on an alternative basis. ***See Commonwealth v. Thompson***, 778 A.2d 1215, 1223 n.6 (Pa. Super. 2001). As noted above, while relevancy[14] is a requirement to admit a statement under the TYE, there must

_____

[14] The parties and trial judge had a conversation regarding the necessity of an in camera hearing on the issue of relevancy of the video testimony. ***See*** N.T. Trial, 8/23/18, at 4-6. The Commonwealth's attorney represented to the court that as long as the circumstances under which the statements were given were reliable, then the court did not have to have a formal in camera review of the evidence under the TYE. Rather, the ADA stated, "the [c]ourt does have to make a finding that – after having reviewed the evidence with the jury." ***Id.*** at 5. The trial judge responded, "I already made that determination, that the video was **relevant**, based on what you represented and on what counsel represented." ***Id.*** (emphasis added). The trial court then ruled on the admissibility of the video

also be a determination with regard to whether circumstances of the statement provide sufficient indicia of reliability. *See* Pa.R.E. 802(5). Thus, even analyzing the issue under the TYE, we recognize that counsel and the trial court failed to address the reliability of the statements prior to ruling on its admissibility,[15] a requirement under Rule 802(5).[16]

_____

out of the presence of the jury, while they had been excused for lunch. *Id.* 8/22/18, at 63. The court permitted the evidence to be admitted after a discussion with counsel regarding the **relevancy** of the interviews as it "relates to – specifically to the allegations that are made in this case." *Id.* at 64 (emphasis added). The ADA repeatedly stated that the Commonwealth was not seeking to admit the videos as prior consistent statements. *Id.* at 63-64. But, rather, sought to admit them under the Tender Years Exception to hearsay. *Id.* at 63.

[15] However, the trial judge did make the following comment regarding reliability of Children's testimony during its jury instructions:

> The evidence of [Children's] failure to complain, the delay in making a complaint, does not necessarily make their testimony unreliable, but may remove from it the assurance of reliability accompanying the prompt complaint or outcry that the victim of a crime such as this would ordinarily be expected to make.

N.T. Jury Trial, 8/24/18, at 20.

[16] Moreover, we question whether the Commonwealth fulfilled section 5985.1's stringent notice requirement, which states:

> **(b) Notice required**.--A statement otherwise admissible under subsection (a) shall not be received into evidence unless the proponent of the statement notifies the adverse party of the proponent's intention to offer the statement and the particulars of the statement sufficiently in advance of the proceeding at which the proponent intends to offer the statement into evidence to provide the adverse party with a fair opportunity to prepare to meet the statement.

With regard to admitting the evidence as a recorded recollection under Rule 803.1(3), a thorough review of the victims' trial testimony supports the court's conclusion that the victims repeatedly testified that they did not recall or were not sure of specific facts surrounding the alleged sexual assaults. *See* N.T. Jury Trial, 8/22/18, at 24-25, 36, 38-39, 51, 54-61, 78, 81-82, 87-88, 92-93, 96. Therefore, we agree with the trial court that the forensic interviews provided much more detail and accuracy regarding the events in question. The Children, however, did not specifically testify at trial that the videos accurately reflected their knowledge at the time they were made or that they had formally adopted them. Thus, we cannot conclude that this is a non-frivolous issue.

---

42 Pa.C.S.A. § 5985.1(b). "Relative to the notice requirement under this hearsay exception, the Commonwealth has the burden of providing actual notice of an intention to offer the hearsay statement." ***Commonwealth v. O'Drain***, 829 A.2d 316, 320 (Pa. Super. 2003). The section 5985.1(b) "notice provisions are strict and must be strictly observed." ***Commonwealth v. Crossley***, 711 A.2d 1025, 1028 (Pa. Super. 1988). Here, the Commonwealth notified Morales on the second day of *trial*, at the conclusion of Child 1's testimony, that it intended to offer the videos under the TYE. This hardly seems to fulfill the requirement that the "adverse party . . . [receive notice] *in advance of the proceeding at which the proponent intends to offer [it]*." 42 Pa.C.S. § 5985.1(b) (emphasis added). ***See Commonwealth v. Luster***, 2020 PA Super 153 (Pa. Super. filed July 6, 2020) (forensic interview of minor victim improperly admitted, resulting in defendant's convictions and judgment of sentence being vacated and case remanded for new trial, where Commonwealth did not give formal written notice to defendant until day of trial that it intended to offer evidence under TYE and despite fact that Commonwealth provided oral notice of intention to present video one week before trial during plea negotiations and again during jury selection).

In his final two issues on appeal, Morales contends that there was insufficient evidence to support his EWOC convictions and that his EWOC convictions were against the weight of the evidence.

With regard to sufficiency of the evidence, Morales alleges that the evidence was insufficient where the jury acquitted him of all underlying sexual assault charges.[17]

"A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review." *Commonwealth v. Hitcho*, 123 A.3d 731 (Pa. 2015). "The test is whether the evidence admitted at trial supports the jury's finding of all the elements of the offense beyond a reasonable doubt." *Id.* "The entire trial record must be evaluated and all evidence received must be considered." *Commonwealth v. Woods*, 638 A.3d 1013, 1015 (Pa. Super.

---

[17] In its information, the Commonwealth charged Morales with EWOC as Count 3, alleging that:

> On or about 04/01/2014
> On diverse dates between 2012 through 2014 the defendant
>
> Being a parent, guardian, or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, the actor knowingly endangered the welfare of the complainant child by violating a duty of care, protection or support[.]
>
> **Course of Conduct**: Notice is hereby given that the Commonwealth grades the offense as a felony of the third degree under 18 [Pa.C.S.A.] § 4304(b)[,] where there was a course of conduct of endangering the welfare of the complainant child.

Commonwealth's Criminal Information, 5/16/17, at 1 (emphasis added).

1994) (citation omitted). "In reviewing the sufficiency of the evidence, all reasonable inferences must be drawn in favor of the Commonwealth as the verdict winner." ***Commonwealth v. Mitchell***, 902 A.2d 430, 444 (Pa. 2006).

The crime of endangering the welfare of children is defined, in relevant part, as follows:

(a) Offense defined.

(1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person,[18] commits an offense if he knowingly[19] endangers the welfare of the child **by violating a duty of care, protection or support.**

18 Pa.C.S.A. § 4304(a)(1) (emphasis added). Pennsylvania courts have established a three-part test that must be satisfied to prove EWOC:

1) [T]he accused [was] aware of his/her duty to protect the child;

---

[18] The term "person supervising the welfare of a child" means a person other than a parent or guardian that provides care, education, training or control of a child." 18 Pa.C.S.A. § 4304(a)(3). Thus, it is undisputed that Morales, who often babysat Children while N.S. was at work during the day, would fit within this definition. Again, Morales does not challenge this element of the EWOC statute.

[19] Under the Crimes Code, a person acts knowingly with respect to a material element of an offense:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. §§ 302(b)(2)(i) and (ii).

2) [T]he accused [was] aware that the child [was] in circumstances that could threaten the child's physical or psychological welfare; and

3) [T]he accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Pahel*, 689 A.2d 963, 964 (Pa. Super. 1997) (quoting

*Commonwealth v. Cardwell*, 515 A.2d 311, 315 (Pa. Super. 1986)).

In *Commonwealth v. Taylor*, 471 A.2d 1228 (Pa. Super. 1984), our

Court discussed the legislature's intent in enacting section 4304 and its broad

purpose:

> The Supreme Court has said that [s]**ection 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children.  It is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted.** *Commonwealth v. Mack*, [] 359 A.2d 770, 772 ([Pa.] 1976).  Thus, the "common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Id.*, *quoting Commonwealth v. Marlin*, [] 305 A.2d 14, 18 ([Pa.] 1973) and *Commonwealth v. Randall*, 133 A.2d 276, 280 ([Pa. Super.] 1957).

*Id.* at 1231 (emphasis added).  *Compare Commonwealth v. Morrison*, 401

A.2d 1348 (Pa. Super. 1979) (EWOC conviction based on failure of parents to

take child to doctor for two months where burns on child's penis had not healed

and penis began to swell, became infected, and lack of treatment rendered loss

of organ possible) *with Commonwealth v. A.R.C.*, 150 A.3d 53 (Pa. Super.

2016) (evidence insufficient to support EWOC conviction where evidence showed

defendant had no idea child had sustained injuries prior to hospital visit and both

defendant's boyfriend and defendant's mother testified they never saw defendant mistreat child).

Here, counsel acknowledges that Morales' sufficiency of the evidence claim is "logical," but then concludes that it "has no merit because it ignores non-sexual behaviors described in the testimony that lead to the logical inference that [Morales] is in fact guilty beyond a reasonable doubt of EWOC." **Anders** Brief, at 25. Specifically, counsel states that "given the evidence of the violent altercation between [N.S.] and [Morales], it is not at all shocking that the jury would have found beyond a reasonable doubt that [Morales] was guilty of two counts of EWOC as to [Children]." **Id.** at 25-26. In support of his argument that Morales' sufficiency argument "has no merit,"[20] counsel cites to **Commonwealth v. Popow**, 844 A.2d 13 (Pa. Super. 2004), where defendant was acquitted of aggravated assault charges, but convicted of simple assault, defiant trespass, REAP, stalking and EWOC.[21] On appeal, Popow argued that he

_____

[20] We remind counsel that the correct standard required to withdraw from representing a client in a direct appeal is finding the appeal "frivolous," not meritless. **See Cartrette**, **supra**; **Santiago**, **supra**. The two terms are not synonymous. **See Commonwealth v. Smith**, 700 A.2d 1301, 1305 n.10 (Pa. Super. 1997) (noting that our Court has repeatedly held that frivolous is not the same as meritless; "an appeal is frivolous where it lacks any basis in law or fact."), citing **Commonwealth v. Fischetti**, 669 A.2d 399, 401 n.2 (Pa. Super. 1995).

[21] **Popow** is readily distinguishable from the facts of the instant case with regard to the sufficiency of the evidence for Morales' EWOC convictions. In **Popow**, the defendant fell down a flight of twelve stairs while holding his child in one hand trying to fight off three other individuals. Popow later had an altercation with two other individuals while he held a box-cutter in his hand and was hit with a

was improperly sentenced on EWOC as a third-degree felony where "neither the information nor the evidence made out a course of conduct that would raise this charge from a misdemeanor of the first degree to a felony of the third degree and where the jury was not instructed on a course of conduct[.]" *Id.* at 15-16.

Our Court concluded that the "facts presented at trial showed that the entire episode was one event on one night and. . . [that there was a] lack of factual basis in the information or evidence presented at trial to support" the jury finding Popow's acts "were 'separate enough to establish a course of conduct.'" *Id.* at 16. In analyzing the issue, the Court noted that prior decisions of our Court have found that the "logical interpretation of the legislative intent in subsection [4304](b) is that it is designed to punish a parent who over days, weeks, or months, abuses his children, such as repeatedly beating them or depriving them of food." *Id.* at 17. Because EWOC was erroneously graded in

_____

claw-hammer – all in the presence of his four-year-old child. Here, there were no such facts brought out at trial indicating that the fights between N.S. and Morales in the presence of Children escalated to the extent of that in *Popow*. In fact, the only detailed testimony regarding a physical altercation between N.S. and Morales was about a fight that occurred on the evening Morales exposed himself to Child on the living room couch. During that episode, N.S. admitted to swinging and hitting Morales with a closed fist, then trying to get her cell phone in the bedroom at which point Morales "chased after [her] and pinned [her] to the mattress" in the couple's bedroom. *See* N.T. Trial, 8/21/19, at 56. N.S. testified that she did not see Children during this incident when Morales allegedly pinned her to the bed, "[held] her mouth," and prevented her from going to the bathroom alone. *Id.* at 59-60. N.S. testified that she heard Children screaming in the background in their bedroom while these events occurred, but did not see them "at any point between [] going to the bathroom from the bedroom." *Id.* at 61, 64.

- 23 -

the information as a third-degree felony where there were no facts alleged or proven in the case to support the grading, and because the court did not mention "course of conduct" in its EWOC instruction, the Court "conclude[d] that the trial court improperly graded this offense as a felony of the third-degree [and] remand[ed the case] to the trial court for imposition of a sentence within the legal sentencing range and consideration of the sentencing guidelines of this crime as a misdemeanor of the first degree, rather than as a felony of the third degree." *Id.* at 18.

Here, similar to **Popow**: (1) there is no factual basis in the Commonwealth's information or criminal complaint and there was no evidence presented at trial to support a finding that Morales' altercation established a "course of conduct" to support his EWOC conviction; and (2) the trial court did not instruct the jury on the "course of conduct" required for a conviction under section 4304(b).[22] **See Popow**, **supra** at 18 ("'course of conduct' is not an element of the offense of endangering the welfare of a child, but it is an additional fact, a jury question, that impacts the grading of the offense."); **see also** N.T. Jury Trial, 8/24/18, at 34, 43 (during jury instructions in instant case,

_____

[22] As noted earlier, the verdict sheet reflects that the jury made a specific finding that the EWOC charge was based on a "course of conduct," **see supra** at 7-8, and the jury foreperson stated same in rendering the verdict. **See** N.T. Jury Trial, 8/27/18, at 7. However, the judge never instructed the jury on "course of conduct" as it related to EWOC — an additional fact that impacts the grading of the offense. **Popow**, **supra**. Again, we find this flaw in the court's instruction led to a fundamental misunderstanding by the jurors and, potentially, an erroneous verdict. **See infra** n.25.

- 24 -

judge only defined course of conduct with regard to indecent assault and corruption of minors charges). Thus, under **Popow**, it appears that the trial court may have improperly graded the offense as a third-degree felony, thus resulting in an illegal sentence.[23] **Commonwealth v. Hoffman**, 198 A.3d 1112, 1123 (Pa. Super. 2018) ("[A] claim that the court improperly graded an offense for sentencing purposes implicates the legality of a sentence.") (citations and quotation marks omitted).

Like the sufficiency argument advanced by Morales on appeal, the defendant in **Taylor**, **supra**, claimed that because a jury acquitted him of charges of assault and sexual offenses, his conviction for EWOC should be set aside. In **Taylor**, the defendant drove his thirteen-year-old daughter and her twelve-year-old friend to Ocean City, New Jersey, where the three visited the boardwalk until they returned home at approximately 10:15 P.M. **Id.** at 1229. During the car ride home, the defendant drank several beers, became tired, lost his way, and narrowly avoided two accidents. **Id.** When he became too tired to continue driving, defendant stopped at a motel room to spend the night. **Id.** According to the Commonwealth, defendant made sexual advances to the young girls, allegedly choked them, threw them on the bed, grabbed at their private parts, and wrapped his legs around them. **Id.** The Commonwealth also presented evidence that defendant pushed the daughter's friend to the bed,

---

[23] Moreover, "a challenge to the legality of sentence is never waived and may be the subject of inquiry by the appellate court *sua sponte*." **Hoffman**, 198 A.3d at 1123.

causing her to fall, strike her head and sustain a swollen lip. *Id.* Defendant then allegedly exposed his genitalia, removed a packet of condoms from his pocket, and told his daughter that he could prevent her pregnancy by using one. *Id.* The defendant ultimately fell asleep and took the girls home the following morning, threatening to kill them if they told anyone what had happened in the motel room. *Id.*

On appeal, the defendant argued that the jury's acquittal of the sexual offenses "was a rejection of the [victims'] testimony regarding events that allegedly occur[red] in the motel room." *Id.* at 1231. Our Court found defendant's argument meritless, noting that "a fact finder may render inconsistent verdicts," and "[a] jury's verdict in a criminal case will not be set aside merely because it appears to be inconsistent with another verdict of the jurors [s]o long as the challenged verdict is supported by the evidence." *Id. See also Commonwealth v. Miller*, 35 A.3d 1206, 1209 (Pa. 2012) ("[T]he fact that the inconsistency [in the verdict] may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.") (citation omitted).

The *Taylor* Court's reference to inconsistent verdicts, however, appears to be *dicta* where the Court ultimately reversed defendant's EWOC conviction and remanded the case for a new trial because the criminal information "alleged no facts [and did] no more than charge, in the language of the statute, that appellant had endangered the welfare of children" and the criminal complaint "did not aver expressly or by implication that [defendant] had been guilty of acts

committed outside the motel room." *Taylor*, 471 A.3d at 1232. At trial, the Commonwealth's case proceeded on proof of the events that occurred in the hotel room with the victims; "[t]he Commonwealth did not attempt to prove that appellant had been intoxicated while driving his motor vehicle or that he had operated his vehicle in a way that was reckless or even negligent." *Id.* Despite the fact that the case was submitted to the jury without any mention that it was to consider factual issues other than those alleged to have occurred in the motel room, "the court instructed the jury[, over defense objection,] that it was entitled to consider 'all the evidence of any conduct which occurred in this jurisdiction.'" *Id.* at 1233. Concluding that the jury instruction was erroneous because it "permitted the jury to convict appellant on the basis of conduct which had not previously been included in the accusation against him," our Court reversed the appellant's EWOC conviction as "[t]here was no evidence of a knowing violation of a duty of care, protection or support which endangered the welfare of the children before they arrived at the motel." *Id.*

Like the facts in *Taylor*, the affidavit of probable cause, attached to the criminal complaint, alleges that the sexual encounters and viewing of explicit sexual materials formed "the facts tending to establish the grounds for the issuance of the warrant of arrest" for Morales. *See* Criminal Complaint/Affidavit of Probable Cause, 3/18/17, at 1. There is no mention in the criminal complaint or information of any non-sexual events, such as the altercation that counsel refers to in his *Anders* brief, to form the basis of the EWOC charges brought against Morales. *Taylor*, *supra*. *See* N.T. Jury Trial, 8/24/18, at 27 (in

instruction to jury, trial court states, "If, after considering *all the evidence*, you find that the Commonwealth has established beyond a reasonable doubt all of the elements [of EWOC], you must find the defendant guilty.") (emphasis added). Accordingly, to permit the jury to find that Morales' altercation with N.S. constituted a knowing endangerment of the Children's welfare by failing to provide for their care, protection or support appears to be in error. **Taylor**, 471 A.2d at 1233.[24]

Here, Morales was charged with twenty four counts of assault and sexual offenses; the jury acquitted him of all but two counts of EWOC. Morales only contests the sufficiency of the evidence as it applies to the portion of the EWOC statute that requires the perpetrator "violat[e] a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1). Where the criminal complaint predicated *all* charges upon a course of continuing sexual conduct—specifically, testimony from Children and N.S. that Morales exposed himself to Children, touched their private parts, had them perform oral sex on him, and showed them inappropriate videos of sexually explicit material—we are not convinced that this case is a traditional compromise-verdict situation. **See** N.T. Jury Trial, 8/24/18, at 21 (trial judge

---

[24] We will not assess Morales' weight of the evidence claim at this juncture, having found potential merit to his sufficiency of the evidence claim. If Morales is entitled to relief on his sufficiency claim, he is precluded from being retried under double jeopardy grounds unlike a successful weight claim that permits a second trial. **Commonwealth v. Widmer**, 744 A.2d 745, 752 (Pa. Super. 2000).

instructing jury that "information alleges that the crime was committed on diverse dates between January 2012 and June 2014.").[25] Because Morales was acquitted on every single other charge and where sexual conduct formed the factual basis for all charges, including EWOC, we are hard-pressed to find "what particular conduct [of Morales'] [wa]s rendered criminal" to support his EWOC convictions. ***Martin***, ***supra***; ***Randell***, ***supra***. This is especially significant where nothing regarding altercations between N.S. and Morales was mentioned in the complaint or information, despite counsel's insistence in his ***Anders*** brief that this is why the evidence was sufficient to convict Morales of EWOC.

Because there is, at the very least, a potentially meritorious legality of sentencing issue in the instant appeal, and several other non-frivolous issues, we must deny counsel's motion to withdraw and remand for the filing of an advocate's brief. ***See Commonwealth v. Wrecks***, 931 A.2d 717 (Pa. Super. 2007); ***see also Commonwealth v. Kearns***, 896 A.2d 640, 643 n.8 (Pa. Super. 2006) (unless counsel able to satisfy **all** requirements of ***Anders***/***Santiago***, including finding of frivolity as to all possible appellate issues, s/he must file advocate's brief). We direct Attorney Server to file an advocate's brief addressing, at a minimum, the potentially meritorious issues mentioned in his

_____

[25] We believe that the trial court's jury instructions caused confusion with regard to the quantum and quality of the evidence needed to prove EWOC in the instant matter— especially where all charges were predicated upon sexual conduct committed over the course of two years. ***See also supra*** n.22. Under such circumstances, we are hesitant to deem Morales' convictions the result of a compromise verdict.

***Anders*** brief and those discussed herein.  We also direct counsel to address any other potentially meritorious issue(s) that his review of the case may uncover.  ***See Santiago***, 978 A.2d at 360.  Counsel's brief shall be filed within 60 days of the date of this decision.[26]

Case remanded for further action consistent with this memorandum decision.  Motion to withdraw as counsel denied.[27]  Jurisdiction retained.

Judge Pellegrini joins this Memorandum.

Judge Olson concurs in the result.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/9/20

---

[26] The Commonwealth may file a responsive brief 30 days thereafter.

[27] We caution counsel to be more thorough in his recognition and analysis of issues for his clients on appeal, particularity where he deems an appeal frivolous and seeks to withdraw from representation.  ***See Commonwealth v. Orellana***, 86 A.3d 877, 880 (Pa. Super. 2014) ("The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate [o]n behalf of his client, as opposed to that of amicus curiae. . . .  His role as advocate requires that he supports his client's appeal to the best of his ability."), citing ***Anders***, 386 U.S. at 742, 744.  Today, in the first instance, we have advocated for his client by scouring the record and finding issues that are potentially meritorious on appeal.  ***Orellana***, 86 A.3d at 881 (only *after* counsel conscientiously examines case does court then proceed to examine full proceedings to determine if case wholly frivolous).